UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————————————X

S.A., by his parents, M.A.K. and K.S.,

          Plaintiffs,

   –against–

NEW YORK CITY DEPARTMENT OF
EDUCATION,

          Defendant.
——————————————————————————X

**MEMORANDUM AND ORDER**
12-CV-435 (RMM) (MDG)

ROSLYNN R. MAUSKOPF, United States District Judge.

    Parents M.A.K. and K.S. (the "parents"), on behalf of their child, S.A. (the "student"),

bring this action against defendant New York City Department of Education ("DOE") pursuant

to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, seeking

modified de novo review and reversal of the State Review Officer's ("SRO") October 3, 2011

decision, in which the SRO (1) affirmed the Impartial Hearing Officer's ("IHO") June 15, 2011

determination that DOE offered the student a free and appropriate public education ("FAPE") for

the 2010–2011 school year but (2) reversed certain other relief the IHO granted.  DOE cross-

moves for summary judgment.

    After reviewing the administrative record under the modified de novo review standard,

and considering additional evidence ordered during discovery in this action, the Court finds that

the sole violation that rises to the level of denying the student a FAPE is DOE's failure to

provide the parents with appropriate training and counseling. [1]  Accordingly, with respect to all

issues other than parental training and counseling, the SRO's decision is affirmed, plaintiffs'

---

[1] Some nine months after the parties' cross-motions were fully-briefed and filed, plaintiffs have seek leave to file an additional affidavit of the student's father alleging information regarding the student's behavior and functioning since the school year at issue in this action to date.  Defendants object.  *See* Doc. Nos. 45, 46.  The Court declines to consider this information as untimely, outside the proper record on these motions, and not relevant.

motion for summary judgment is denied, and DOE's cross-motion for summary judgment is granted. However, the SRO erred in annulling the IHO's determination that the parents were entitled to at-home training. In this limited respect, the SRO's decision is reversed, plaintiffs' motion for summary judgment is granted, and DOE's cross-motion for summary judgment is denied. Plaintiffs are granted leave to file an application for attorneys' fees and costs consistent with this opinion.

## BACKGROUND

The SRO's findings of fact are generally due appropriate deference by this Court, which is not an expert on education or childhood learning disabilities. This Court, therefore, adopts the SRO's findings of fact as its own unless otherwise noted below. *See W.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006) (adopting SRO's well-articulated factual findings). For the sake of convenience, however, the facts relevant to the instant determination are restated in summary fashion as follows.

### I.   Developing the IEP

#### A.  Committee on Special Education Meeting

On April 28, 2010, a Committee on Special Education ("CSE") convened to develop an IEP for the student, an eight-year-old diagnosed with autism. Except for making some one-word communications, the student was largely non-verbal. He also had difficulty focusing, was easily distracted, required frequent prompts, disliked loud noises, and engaged in self-stimulatory behaviors such as flapping his arms non-purposefully. Since 2008, he had attended P.S. 256, a special DOE school with ninety students that employs the Treatment and Education for Autistic and Other Communication Handicapped Children ("TEACCH") method.

The CSE meeting participants included the parents (by telephone); Assistant Principal Kris Melbourne; Theresa Hoffman, the student's special education teacher for the 2009–2010 school year; Christine Mahoney-Schneider and Luanne Horne, respectively the student's speech-language and occupational therapists for the 2009–2010 and 2010–2011 school years; and a school psychologist and general education teacher who observed the student in his classroom. The team discussed documents including a classroom observation and reports from Hoffman, Mahoney-Schneider, and Horne. Although the parents provided independent evaluations from the private McCarton Center for Developmental Pediatrics (the "McCarton Center"), the CSE did not discuss these evaluations.

The parents were not physically present at the CSE meeting but participated by telephone. They had, approximately two months earlier, submitted a request for an IHO hearing concerning the previous school year (2009–2010), seeking a program incorporating the McCarton Center's recommendations. This submission from the parents prompted the CSE to convene in April 2010 concerning the upcoming school year (2010–2011) and was before the CSE when it convened. Before the CSE meeting, the parents received draft goals for the student, and the CSE solicited their opinions. At the parents' request, the CSE added a feeding goal to the IEP.

The CSE discussed the student's general academic functioning, including his speech-language functioning; his health and physical development, including occupational therapy needs; and his deficits in academic, social, and emotional functioning. The CSE considered the fact that while the student had difficulty focusing, was easily distracted, required frequent prompts, disliked loud noises, and engaged in self-stimulatory behaviors, he had made some progress. The CSE determined that conducting a functional behavioral assessment ("FBA") and

devising a specific behavior intervention plan ("BIP") were unnecessary. The parents informed the CSE that they were unable to attend parent trainings at the school because DOE offered them on weekdays, when the father's employment in New Jersey and the mother's other childcare obligations prevented them from attending.

**B. The IEP**

The IEP contains seemingly contradictory statements about the extent to which the student's problematic behaviors impede his ability to learn. On the one hand, the IEP states that the student's need for redirection has decreased and the teacher can manage the behavior, which does not seriously interfere with instruction. On the other hand, the IEP reports that the student's cravings for constant movement pose a frequent challenge to his staying seated and participating in classroom desktop work, and that his self-stimulatory movements significantly impede his ability to learn.

In the IEP, the CSE recommended a twelve-month program, to be implemented as of April 29, 2010, in a special school with a staffing ratio of six students to one teacher and one paraprofessional ("6:1:1"); 1:1 speech-language therapy once per week for thirty minutes; 2:1 speech-language therapy twice per week for thirty minutes; 1:1 physical therapy twice per week for thirty minutes, and 1:1 occupational therapy three times per week for thirty minutes. The IEP provides goals for the student relating to attention span, reading comprehension, math, social interaction, feeding, motor skills, communication, and adaptive physical education, including twelve annual goals and thirty-five short-term objectives.

The IEP contains only two references to parent training and counseling. First, the IEP states that the student's mother "report[s] that she has received invitations to parent trainings but

is unable to attend due to the school being too far from home."  IEP at 3–2.  Second, the IEP

states that "Parent trainings are offered."  *Id*. at 4.

On May 3, 2010, DOE sent the parents a final notice of its IEP recommendation.  By

letter dated June 10, 2010, the parents rejected the student's placement and some of the items on

his IEP and informed DOE that they intended to place him at the McCarton Center as soon as

they were able.

The student, however, was never enrolled in private school, and remained in DOE

programs for the entire 2010–2011 school year, which began with the summer 2010 session.

## II.     IHO Review

### A.  Due Process Complaint

On July 7, 2010, the parents filed an amended due process complaint, alleging that DOE

failed to offer the student a FAPE for the 2010–2011 school year.  As relief, plaintiffs requested

compensatory education for services the student should have received during the 2009–2010

school year; reimbursement for any amounts they had paid; and prospective funding for private

school tuition and other private services during the 2010–2011 school year, including a minimum

of forty weekly hours of 1:1 applied behavioral analysis ("ABA") therapy at school and at home,

four weekly hours of program supervision and coordination by a Board Certified Behavior

Analyst, five weekly hours of 1:1 speech-language therapy, three weekly hours of feeding

therapy, four weekly hours of occupational therapy, two thirty-minute physical therapy sessions

per week, auditory integration therapy, monthly team meetings, evaluation and possible

integration of a picture exchange communication system ("PECS"), parent training and

counseling, and transportation to and from school with a commute no longer than one hour each

way.  The parents did not, at this point, specify whether they wished for the private services to

occur at any particular school or program. Nor, as stated above, did they enroll the student in a private program.

## B. IHO Hearing

The IHO hearing spanned twelve non-consecutive dates between September 2010 and May 2011. The IHO heard testimony from DOE witnesses including Assistant Principal Melbourne; teacher Shandel Horowitz, who began teaching the student in September 2010; speech-language therapist Mahoney-Schneider; occupational therapist Horne; and physical therapist Karen Ronen. The IHO also heard testimony from several witnesses plaintiffs presented, including witnesses from the McCarton Center; a behavioral specialist who evaluated the student; Ivon Jules, the classroom paraprofessional assigned to the student's class since September 2010; the Director of Placement for DOE District 75; and the student's father.

Assistant Principal Melbourne testified that the CSE decided an FBA was unnecessary because the student's interfering behaviors, though not completely extinguished, had decreased during the previous school year and were not interfering with his ability to function and participate in the classroom, as he could be easily redirected and brought back to task. Horowitz, Mahoney-Schneider, Horne, and Ronen, who all had familiarity with the student over an extended period, testified about their techniques and reported both that the student was making progress, and that they expected him to reach his annual IEP goals. For example, Horowitz, Ronen, and Mahoney-Schneider testified that the student was progressing in socialization and peer interactions. Horowitz and Mahoney-Schneider also testified that the student's behaviors were not interfering with instruction.

In contrast, plaintiffs presented testimony from witnesses including (1) Carol Fiorile, a behavior analyst who observed the student once in his home, did not provide a written report,

and testified that the student had made absolutely no progress since August 2009 and had such poor instructional control that he could not be instructed; (2) Dr. Cecilia McCarton, a developmental pediatrician, who evaluated the student and testified that he could not learn in a classroom and required ABA instruction; (3) Meredith Weprin, a McCarton Center speech-language therapist, who testified that the student needed 1:1 behavior therapy for instructional control, some of his IEP goals were too high, and he would surely regress if he did not receive the services she recommended; and (4) Maria Bruzzaro, a McCarton Center occupational therapist, who never observed the student in the classroom or provided him services but testified that his IEP goals were too few and rudimentary, and that he could not make meaningful gains in the classroom.

With regard to the summer 2010 session, DOE presented little evidence that it fulfilled the student's IEP mandate. While the parties agreed that the student was placed in a school across the street from P.S. 256 for the summer session due to construction, the hearing witnesses were unaware who taught the student and provided his related services during the summer, or what methods they used. The parents claimed that the summer teacher was switched midway through the session, and that the student was bitten by a peer and sustained other minor injuries. An IEP goals update from August 10, 2010, indicates that the student had made progress toward half of his annual IEP goals and little progress toward the remaining half but was expected to meet all of them. The student's October 2010 Brigance Inventory also reflected that he had made progress over the summer.

### C. The IHO's Decision

The IHO issued a lengthy, well-reasoned decision on June 15, 2011, after the bulk of the 2010–2011 school year had elapsed. In this decision, the IHO concluded that, viewing the 2010–

2011 school year as a whole, DOE provided the student with a FAPE. Specifically, the IHO found:

- With regard to the portion of the 2009–2010 school year during which the April 28, 2010, IEP was in place (April 29, 2010, through June 30, 2010), the student was not entitled to compensatory education because the alleged FAPE deprivation was neither gross nor for a substantial time period, and because the requested relief of 1:1 ABA instruction was not tailored to the student's circumstances;

- With regard to the summer of 2010, DOE failed to meet its burden to prove that the student received a FAPE, and the CSE must reconvene to provide compensatory services for this six-week lapse. However, the IHO also found that this lapse did not deprive the student a FAPE for the entire 2010–2011 school year;

- In the limited sense that DOE failed to provide the parents with appropriate training, DOE violated the student's right to a FAPE. However, this violation did not require invalidating the entire IEP, and the appropriate remedy was for plaintiffs to receive five weekly hours of at-home parental training for a period of fifty-two weeks;

- Viewing the 2010–2011 school year as a whole, DOE offered the student a FAPE because (1) the CSE was comprised of the student's then-current teacher and related service providers, who believed he had progressed using the TEACCH method; (2) the CSE reasonably credited these DOE professionals, who, unlike the witnesses from the McCarton Center, worked with the student in a classroom setting over an extended time period (3) the student's instructional staff and related service providers for the 2010–2011 school year corroborated the IEP by testifying persuasively at the IHO hearing that the student was able to learn in a classroom and had met, or was expected to meet, his IEP

goals; and (4) any procedural errors relating to the IEP did not deprive the student of a

FAPE or significantly impede the parents' opportunity to participate in the decision-

making process;

- Because DOE did not deprive the student of a FAPE, plaintiffs were not entitled to

  private school tuition pursuant to *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S.

  359 (1985); and

- The student should receive an auditory integration evaluation, and the CSE must

  reconvene immediately to review his commute time and add appropriate transportation

  requirements to the IEP.[2]

## III.    SRO Review

Plaintiffs appealed to the SRO, and DOE cross-appealed.  In a lengthy and detailed

decision dated October 3, 2011, the SRO affirmed the IHO's decision to the extent the IHO ruled

for DOE but reversed the IHO's award of compensatory education for plaintiffs.  More

specifically, the SRO found that the IHO exceeded the amended due process complaint's scope

by making a determination regarding the summer 2010 program, and that even if DOE failed to

provide a FAPE for summer 2010, that deprivation did not affect the student in a material way

because he made progress over the summer.  With regard to parental training, the SRO found

that although DOE erred in failing to detail such training in the IEP, this procedural violation did

not violate the student's right to a FAPE.  Accordingly, the SRO vacated the IHO's order for at-

home parental training.  As discussed below, in doing so, the SRO did not address the parental

---

[2]  In reaching this conclusion, the IHO and, subsequently, the SRO failed to address plaintiffs' argument that DOE
violated a New York regulation that was in effect prior to December 8, 2010, and required that autistic children
receive speech therapy "for a minimum of 30 minutes daily in groups not to exceed two, or 60 minutes daily in
groups not to exceed six."  *P.K. ex rel. S.K. v. New York City Dep't of Educ.*, 819 F. Supp. 2d 90, 109 n.9 (E.D.N.Y.
2011) (quoting 8 N.Y.C.R.R. § 200.13(a)(4)), *aff'd*, 526 F. App'x 135 (2d Cir. 2013).

training claim in light of plaintiffs' general argument that DOE also substantively violated the student's right to a FAPE by failing to provide appropriate at-home services.  Finally, the SRO found that nothing precluded the IHO from directing the CSE to consider plaintiffs' transportation-related concerns.

## IV.    The Instant Action

On January 31, 2012, plaintiffs appealed the SRO's decision by filing the instant complaint, seeking (1) modified de novo review and reversal of the SRO's decision; (2) a determination that the student is entitled to compensatory education from as early as April 29, 2010, onward; (3) a determination that DOE failed to offer the student a FAPE for the entire 2010–2011 school year; (4) reimbursement for unspecified expenses; (5) a determination that plaintiffs' proposal of at least forty weekly hours of 1:1 ABA therapy in school and at home, plus unspecified "related" school-, home-, and community-based services, was reasonably calculated to provide the student with meaningful educational benefits; (6) prospective funding for said ABA therapy and "related" services; and (7) leave to file an application for attorneys' fees and other recoverable costs pursuant to statutory fee-shifting provisions.  (Compl. ¶¶ 8, 22 (Doc. No. 1.).)

On June 13, 2012, Magistrate Judge Go granted plaintiffs limited discovery concerning the summer 2010 session, ordering DOE to produce certain documents concerning that session and allowing plaintiffs to depose the student's two summer teachers.  June 13, 2012 Order. Plaintiffs deposed those teachers, Garry Patillo and Jennifer Rumfelt, in August and October, 2012, respectively, more than two years after they each taught the student for two to three weeks. Neither teacher recalled a significant amount about the student's unique needs or curriculum

during that summer.  DOE also produced a school nurse's incident report reflecting that one of the student's peers bit him during that summer.

**DISCUSSION**

I.      **The IDEA**

     A.  **Requirement to Provide a FAPE**

     The IDEA provides federal funding to states that develop plans to assure all children with disabilities the right to a FAPE.  20 U.S.C. §§ 1412(1), 1415.  A FAPE must include special education and related services tailored to meet the child's unique needs and be reasonably calculated to enable him to receive educational benefits.  *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998); 20 U.S.C. § 1401(a)(18).  For an IEP to be adequate, it must be likely to produce progress rather than regression and afford the student "an opportunity greater than mere trivial advancement."  *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (internal quotation marks omitted).  The IDEA, however, does not require the IEP to furnish every special service necessary to maximize each child's potential.  *Id.*  New York receives federal funds under the IDEA and, therefore, must comply with the IDEA's requirements.

     Accordingly, DOE must, at least annually, set forth the student's particular needs, and the services required to meet those needs, in an IEP that includes (1) his present levels of academic achievement and functional performance; (2) annual goals, including short-term instructional objectives; (3) updates describing how he is progressing toward these annual goals; (4) the special education, related services, and supplementary aids and devices he will receive; (5) the extent to which he will be able to participate in a regular educational program; (6) the proposed services' projected initiation date and duration; and (7) objective criteria, evaluation procedures,

and schedules for determining, on at least an annual basis, whether the student is achieving his instructional objectives.  20 U.S.C. § 1414(d).

## B.  Burden of Proof

While, the Supreme Court has held that default rule in IDEA cases is that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief," *Schaffer v. Weast*, 546 U.S. 49, 62 (2005), New York State law reallocates the burden of proof for some administrative hearings in IDEA cases, providing that the school district bears the burden of proof at the IHO hearing, "except that a parent . . . seeking tuition reimbursement for a unilateral parental placement [in a private school] shall have the burden of persuasion and . . . production on the appropriateness of such placement."  N.Y. Educ. L. §4404(1)(c); *see M.H.*, 685 F.3d at 255 n.3.  Both the Supreme Court and the Second Circuit have declined to address whether this statutory burden-reallocation is permissible.  *See Schaeffer*, 546 U.S. at 62; *M.H.*, 685 F.3d at 255 n.3.  The Circuit, however, has held that where, as in the instant case, plaintiffs seek judicial review of an SRO's determination that an IEP was proper, plaintiffs bear the burden of proof.  *See M.H.*, 685 F.3d at 255 n.3 ("Because the State Review Officers in the cases at bar concluded that the IEPs were proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating that the respective Review Officers erred is properly understood to fall on the plaintiffs."); *see also M.S. v. New York City Dep't of Educ.*, No. 13 CV 3719, 2013 WL 6028817, at *2 n.2 (E.D.N.Y. Nov. 13, 2013) ("[W]here the SRO concluded that the IEP w[as] proper and the plaintiffs seek additional review by the court, the burden of demonstrating that the [SRO] erred is properly understood to fall on the plaintiffs.") (internal quotation marks omitted).  Accordingly, plaintiffs bear the burden of proof before this Court.

### C.  Types of Relief

#### 1.  Compensatory Education

The IDEA allows a hearing officer to fashion an "appropriate remedy, and . . . compensatory education is an available option . . . to make up for denial of a [FAPE]."  *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 122 (2d Cir. 2008) (affirming compensatory education award for elementary school student); *see also Student X v. New York City Dep't of Educ.*, No. 07 CV 2316, 2008 WL 4890440, at *24 (E.D.N.Y. Oct. 30, 2008) (awarding compensatory education to student younger than twenty-one).  Such an award serves "to compensate a student who was actually educated under an inadequate IEP" and "to catch-up the student to where he should have been absent the denial of a FAPE."  *Brennan v. Regional Sch. Dist. No. 1 Bd. of Educ.*, 531 F. Supp. 2d 245, 265 (D. Conn. 2008).  Before awarding compensatory education for a student older than twenty-one, a court must find a gross violation of the student's right to a FAPE; however, whether the same prerequisite exists to awarding compensatory education for a younger student is an open question.  *See Student X*, 2008 WL 4980440, at *24.  *P. v. Newington*, 512 F. Supp. 2d 89, 112 n.3 (D. Conn. 2007) ("The Court disagrees with the defendant's argument that compensatory education is warranted only if there is a 'gross' violation of the IDEA.  The requirement of a gross violation . . . has been applied only to cases involving claimants over the age of 21."), *aff'd*, 546 F.3d 111 (2d Cir. 2008); *but see J.A. v. E. Ramapo Cent. Sch. Dist.*, 603 F. Supp. 2d 684, 690 (S.D.N.Y. 2009) (finding that five-year-old student was not entitled to compensatory speech therapy, reasoning that parents failed to show gross violation because child "was not excluded from school for any period of time.").

### 2.  Private School Tuition

Broadly speaking, courts have required a school district to pay for a student to attend private school in three types of cases.  First, courts will order a school district to reimburse parents who reject a proposed IEP and unilaterally enroll their child in private school where (1) the school district failed to provide a FAPE, (2) the private school placement is appropriate, and (3) the equities warrant reimbursement.  *F.L. ex rel. F.L. v. New York City Dep't of Educ.*, No. 11 CV 5131, 2012 WL 4891748, at *5 (S.D.N.Y. Oct. 16, 2012)*; see Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).  Second, a court may issue a "prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school," where a private placement the parents desired was proper and an IEP calling for placement in a public school was inappropriate.  *Burlington*, 471 U.S. at 369; *see Mr. and Mrs. A. ex rel. D.A. v. New York City Dep't of Educ.*, 769 F. Supp. 2d 403, 427 (S.D.N.Y. 2011); *S.W. ex rel. M.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 360 (S.D.N.Y. 2009) ("Some courts have . . . ordered school districts to make prospective tuition payments directly to a private school."), *aff'd*, 725 F.3d 131 (2d Cir. 2013).  Third, in some extreme cases of FAPE deprivation, courts have ordered a school district to provide the student with compensatory education in private school.  *See D.A.*, 769 F. Supp. 2d at 425–26 (collecting cases).

### D.  District Court Review

### 1.  Exhaustion Requirement

A parent who disagrees with his or her child's IEP or other decisions regarding services for the child may request an impartial due process hearing before the state or local educational agency.  *See* 20 U.S.C. §§ 1415(f); 16 N.Y. Educ. Law § 4404.  While the Second Circuit has not

opined on whether a plaintiff's failure to exhaust administrative remedies under the IDEA

deprives a court of subject matter jurisdiction, several district courts have held that it does.  *See,*

*e.g., L.K. v. Dep't of Educ. of the City of New York*, No. 09 CV 2266, 2011 WL 127063, at *5

(E.D.N.Y. Jan. 13, 2011) (quoting *Engwiller v. Pine Plains Cent. Sch. Dist.*, 110 F. Supp. 2d

236, 245 (S.D.N.Y. 2000) ([F]ailure to exhaust deprives a district court of subject matter

jurisdiction over the [action].")).

### 2.  Standard of Review

A summary judgment motion in an IDEA case serves as a "pragmatic procedural

mechanism for reviewing" a prior administrative determination.  *Lillbask ex rel. Mauclaire v.*

*Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted); *see*

*also L.K.*, 2011 WL 127063, at *5 (stating that IDEA summary judgment motions are "'in

substance an appeal from an administrative determination, not summary judgment'") (quoting

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).

The district court's standard of review is a "modified de novo review" of the

administrative proceedings based on the preponderance of the evidence.  *L.K.*, 2011 WL 127063,

at *5.  The Supreme Court has explained that this review "is by no means an invitation to the

courts to substitute their own notions of sound educational policy for those of the school

authorities which they review."  *Rowley*, 458 U.S. at 206.  "While federal courts do not simply

rubber stamp administrative decisions, they are expected to give due weight to these

[administrative] proceedings, mindful that the judiciary generally lacks the specialized

knowledge and experience necessary to resolve persistent and difficult questions of educational

policy."  *Walczak*, 142 F.3d at 129 (internal quotation marks omitted); *see also Grim v.*

*Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003) (stating that district court should

not choose between conflicting expert views on controversial issues of educational policy).

Deference is appropriate where the administrative reviews were thorough and careful. *Id.*;

*accord. M.H. v. New York City Dep't of Educ.*, No. 09 CV 3657, 2010 WL 1904005, at *17

(S.D.N.Y. May 10, 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012). Where the SRO disagreed with

the IHO, courts "generally defer to the final decision of the state authorities." *M.H.*, 685 F.3d at

241 (internal quotation marks omitted). However, the level of deference the court should extend

depends on the quality of the SRO's opinion, taking into account the factors that normally

determine whether any particular judgment is persuasive but bearing in mind "the statutory

context and the administrative judges' greater institutional competence on matters of educational

policy." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012). Accordingly,

an SRO's determination regarding an IEP's substantive adequacy should receive more deference

than his determination concerning whether DOE developed the IEP using proper procedures. *Id.*

(citing *M.H.*, 685 F.3d at 244). Likewise, an SRO's determination in a dispute concerning

appropriate educational methodology should receive more deference than his determination

regarding whether there are objective indications of progress. *Id.* Further, if a court concludes

that "the SRO's determinations are insufficiently reasoned to merit . . . deference, and in

particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it

is entirely appropriate for the court . . . to consider the IHO's analysis, which is also informed by

greater educational expertise than that of judges." *Id.* (quoting *M.H.*, 685 F.3d at 246).

## II.    Analysis of Plaintiffs' Claims

### A.  Claims Relating to the IEP

To determine whether an IEP was appropriate, a court must consider (1) whether the

school district complied with the IDEA's procedural requirements and (2) whether the IEP was

reasonably calculated to confer educational benefits. *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982).

### 1. Procedural Claims

Compliance with IDEA procedures is critical to ensure that DOE meets a student's special educational needs. *See Rowley*, 458 U.S. at 206. However, not every procedural error in developing an IEP renders the IEP legally inadequate. *Grim*, 346 F.3d at 381. A procedural error renders an IEP invalid only if the error "depriv[es] a student of his right to a [FAPE]." *Id.*; *see also E.H. ex rel. C.H. v. Bd. of Educ. of Shenendehowa Central Sch. Dist.*, No. 05 CV 927, 2008 WL 3930028, at *7 (N.D.N.Y. Aug. 21, 2008) ("[T]here must be some evidence that procedural defects compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."), *aff'd*, 361 F. App'x 156 (2d Cir. 2009). The Circuit has emphasized, however, that "even minor violations may cumulatively result in a denial of a FAPE." *R.E.*, 694 F.3d at 191.

Plaintiffs argue that DOE failed to adhere to proper procedures in developing the IEP because (a) the parents were not physically present at the CSE meeting, (b) the CSE failed to conduct an FBA and devise a BIP, (c) the CSE failed to consider the independent evaluations the parents provided, and (d) the IEP did not provide for parent training and counseling. As discussed more fully below, the Court finds that DOE committed procedural violations by failing to consider the independent evaluations from the McCarton Center and failing to detail in the IEP what parental training and counseling DOE would provide. However, these procedural violations, taken alone or together, did not deprive the student of a FAPE. Each will be addressed in turn.

### a. Parental Participation in Developing IEP

The team that devises a student's IEP must include the parents unless the parents waive their attendance in writing. *See* 20 U.S.C. § 1414(d)(1); 34 C.F.R. § 300.321; N.Y. Educ. L. § 4402 ("[S]uch additional parent shall not be a required member if the parents request that such additional parent member not participate."). Further, pursuant to 34 C.F.R. § 300.328, the parents and the public agency "may agree to use alternative means of meeting participation, such as . . . conference calls."

Plaintiffs argue that the IEP was procedurally inadequate because the parents' participation in the IEP meeting was conducted by phone. The Court disagrees. The very fact that the parents participated telephonically suggests that they agreed to do so, and plaintiffs make no argument to the contrary. Further, courts have repeatedly found no IDEA violation where a CSE member participated telephonically in an IEP meeting. *See, e.g.*, *T.L. ex rel. B.L. v. Dep't of Educ. of the City of New York*, No. 10 CV 3125, 2012 WL 1107652 (E.D.N.Y. Mar. 30, 2012) (granting DOE summary judgment where parents participated telephonically); *T.G. ex rel. R.P. v. New York City Dep't of Educ.*, No. 12 CV 6058, 2013 WL 5178300, at *3 (S.D.N.Y. Sept. 16, 2013) (granting DOE summary judgment where teacher participated telephonically); *E.F. v. New York City Dep't of Educ.*, No. 12 CV 2217, 2013 WL 4495676, at *3 (E.D.N.Y. Aug. 19, 2013) (same); *M.W.*, 725 F.3d 131 (affirming summary judgment for DOE where teacher participated telephonically). Here, moreover, the parents do not argue that participating telephonically prevented them from contributing to the meeting. In fact, the CSE convened at the parents' request; the parents received draft IEP goals for the student before the CSE meeting, the CSE solicited the parents' opinions; the CSE added a feeding goal to the IEP at the parents' request; and the IEP incorporates information from the parents, such as details concerning the student's

eating habits and preferred toys.  Accordingly, the Court agrees with the SRO's finding that the parents' telephonic participation did not impede the student's right to a FAPE or significantly impede their opportunity to participate in the decision-making process.  This claim, therefore, fails.

### b.  Failure to Conduct an FBA and Devise a BIP

The IDEA provides that if a student's behavior impedes his or others' learning, the CSE shall "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i); *see also* 34 C.F.R. § 300.324(a)(2)(i).  More specifically, New York regulations provide that if a student's behaviors impede his or others' learning, his initial evaluation must include an FBA, and the CSE must arrange for appropriate reevaluations at least every three years.  8 N.Y.C.R.R. § 200.4(b).[3]  While the state regulations require that the FBA contain sufficient information to form the basis for a BIP, they do not require a BIP for every student who receives an FBA.  *See* 8 N.Y.C.R.R. § 200.22(a)(b)(1) (requiring the CSE to "consider" developing a BIP).  Depending on the circumstances of the case, a court may find an IEP defective for failing to include an FBA and a BIP.  *See, e.g.*, *R.E.*, 694 F.3d at 190.  Omitting an FBA "seriously impairs substantive review of the IEP because courts cannot determine exactly what information an FBA would have yielded and whether that information would be consistent with the student's IEP."  *Id*. at 190.  Therefore,

---

[3] The IDEA incorporates "some but not all state law concerning special education."  *A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Central Sch. Dist.*, 553 F.3d 165, 172 n.1 (2d Cir. 2009).  The Second Circuit appears to assume that the IDEA incorporates New York's regulations concerning when an FBA is appropriate.  *See R.E.*, 694 F.3d 167.  Pursuant to 8 N.Y.C.R.R. § 200.22(a)(2), the FBA must, as appropriate, be based on multiple data sources, including "information obtained from direct observation of the student, information from the student, the student's teacher(s) and/or related service provider(s), a review of available data and information from the student's record and other sources including any relevant information provided by the student's parent."  Also, the FBA must "provide a baseline of the student's problem behaviors . . . with regard to frequency, duration, intensity and/or latency across activities, settings, people and times of the day" and include certain information in sufficient detail "to form the basis for a [BIP] for the student that addresses antecedent behaviors, reinforcing consequences of the behavior, recommendations for teaching alternative skills or behaviors and an assessment of student preferences for reinforcement."  8 N.Y.C.R.R. § 200.22(a)(3).

"when an FBA is not conducted, the court must take particular care to ensure that the IEP

adequately addresses the child's problem behaviors." *Id.*; *see A.C.*, 553 F.3d at 172 (finding that

IEP omitting FBA and BIP provided appropriate strategies for student's problematic behaviors

because IEP addressed student's attention problems by providing a personal aide and his speech

problems by providing psychiatric and psychological services); *R.K. ex rel. R.K. v. New York

City Dep't of Educ.*, No. 09 CV 4478, 2011 WL 1131492, at *18 (report and recommendation)

("[C]ourts have been willing to overlook the absence of an FBA and BIP where the IEP contains

alternatives that provide functionally equivalent benefits."), *adopted by* 2011 WL 1131522

(E.D.N.Y. Mar. 28, 2011), *aff'd*, *R.E.*, 694 F.3d 167 (2d Cir. 2012).  Nevertheless, the Circuit has

cautioned that cases such as *A.C.* "should not be read as approving the practice of routinely

omitting an FBA.  New York regulations do not permit this shortcut." *R.E.*, 694 F.3d at 190.

The New York regulations "typically" require an FBA "only as part of an initial

evaluation, or as a response to disciplinary actions attributable to conduct found to be a

manifestation of the student's disability." *F.L.*, 2012 WL 4891748, at *8 n.9.  The IEP in this

case, however, "results from an annual review rather than an initial evaluation or discipline

referral." *Id.*  At the same time, the Court is not inclined simply to defer to the SRO's

determination that an FBA was unnecessary.  The SRO's decision, though thorough and well-

reasoned in most respects, does not address the seemingly contradictory statements in the IEP

concerning how much the student's behaviors impede his learning. *See R.E.*, 694 F.3d at 189

(stating that level of deference court should extend depends on quality of SRO's opinion).

The ultimate question is whether the lack of an FBA renders substantive review of the

IEP impossible, *see id.* at 190, and, if not, whether the IEP contains appropriate strategies for

managing the student's problematic behaviors, *see id.* at 192; *A.C.*, 553 F.3d at 172.  Here, the

lack of an FBA does not make substantive review of the IEP impossible.  The IEP provides

significant detail concerning the student's problematic behaviors – reporting, for example, that

he is easily distracted; has great difficulty focusing; dislikes loud noises and, as a result, may

sometimes cry or lash out at another child who is making noise; self-stimulates over objects he

likes by non-purposefully flapping his arms and rocking his body; does not yet socialize with

peers, except to stand near them when they have something he likes; and constantly seeks gross

motor movement, such that keeping him sitting to participate in classroom desktop work is often

challenging.  Moreover, plaintiffs do not argue that the student engaged in other interfering

behaviors that the IEP fails to address.

However, the IEP provides appropriate strategies for managing these behaviors.

Specifically, the IEP (1) states that the student benefits from visual tools, such as an individual

symbol/word schedule to help him transition to and from activities, a "first/then board" to make

expectations clear, and a PECS book to communicate his wants and needs more independently;

and (2) recommends speaking to the student in a gentle voice and utilizing simplified language,

modeling, and positive reinforcement.  The record reflects that these strategies proved helpful to

the student during the 2009–2010 school year, such that he required less redirection and learned

to make simple verbal requests.  *See* IEP at 3–1.  The CSE, therefore, had reason to conclude that

these interventional strategies both contributed to the student's progress to date and would

continue to help him progress the following year.[4]  Accordingly, the lack of an FBA and BIP did

not substantively deprive the student of a FAPE, and this claim fails.

---

[4] The Court defers to the SRO's finding that these methods were appropriate only insofar as he considered what the
CSE knew when it devised the IEP.  In contrast, the Court does not defer to the SRO's analysis insofar as he cites
retrospective evidence concerning the student's progress during the 2010-2011 school year to corroborate the IEP's
strategies.  This retrospective component of the SRO's analysis may have been inappropriate, though the rule is not
entirely clear in a case where, as here, the parents never enrolled the student in private school.  *See R.E.*, 694 F.3d at
186-87 (stating, in a case where parents sought reimbursement for unilaterally placing student in private school after
rejecting IEP, that a school district "cannot rehabilitate a deficient IEP after the fact," and limiting parties "to

### c. Failure to Consider Private Evaluations

A CSE is required, in making any decision concerning providing a student with a FAPE, to consider independent educational evaluations the parents have provided at their own expense, provided the evaluations meet DOE criteria. 34 C.F.R. § 300.502(c); 8 N.Y.C.R.R. § 200.5(g)(1)(vi). Here, the CSE failed to discuss the independent evaluations the parents provided from the McCarton Center. Nevertheless, the Court agrees with the SRO that this did not impede the student's right to a FAPE, significantly impede the parents' opportunity to participate in the decision-making process, or cause a deprivation of educational benefits. As the SRO found, the private evaluators assessed the student's skills similarly to his teacher and therapists. *Cf. M.H.*, 685 F.3d at 256 ("[E]ven assuming . . . the district failed to review these outside reports, we disagree with the appellants' contention that [the student's] IEP therefore failed to reflect his then-current needs."). Although the private evaluators opined that the student could not learn in a classroom, they had limited contact with the student, particularly in a classroom setting. As such, CSE reasonably credited the DOE professionals, who worked with the student in a classroom setting over an extended time period, and developed the IEP with their substantial input. Accordingly, as the SRO found, the failure to consider these outside evaluations does not render the IEP invalid, and this claim fails. *See Grim*, 346 F.3d at 381.

### d. Failure to Detail Parental Training and Counseling in IEP

New York regulations require DOE to provide counseling and training "for the purpose of enabling parents [of students with autism] to perform appropriate follow-up intervention activities at home." 8 N.Y.C.R.R. § 200.13(d). Parental counseling and training "means assisting parents in understanding the special needs of their child; providing parents with

---

discussing the placement and services specified in the [IEP] and therefore reasonably known to the parties at the time of the placement decision"). Regardless, the Court finds the retrospective evidence superfluous and does not rely on it.

information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's [IEP]." *Id*. § 200.1(kk). New York regulations also require that, "to the extent practicable," and "as appropriate," the IEP indicate "the extent to which the student's parents will receive parent counseling and training . . . , when appropriate. *Id*. § 200.4(d)(2)(v)(b)(5). The presence or absence of a parent-counseling provision in the IEP, however, "does not necessarily have a direct effect on the substantive adequacy of the plan." *R.E.*, 694 F.3d at 191. Moreover, because state regulations require DOE to provide parent counseling, DOE remains accountable, and parents "can file a complaint at any time if they feel they are not receiving this service." *Id*.

Plaintiffs argue that DOE committed a procedural violation by failing to detail parent training and counseling in the IEP. They also make a related, though general, substantive claim that DOE failed to provide the student with at-home services he needed. At the IHO hearing, the student's father testified that he and the student's mother were unable to attend the trainings because DOE offered them on weekdays, when his employment in New Jersey and the mother's other childcare obligations prevented them from attending. The father testified that he believed he had requested that the school conduct trainings after hours, but he could not recall when, or to whom, he made the request. The IHO credited the father's testimony that the parents were unable to address appropriately the student's personal care issues, including toileting and feeding; reinforce the speech gains he made at school; otherwise communicate with the student; or encourage socialization. Assistant Principal Melbourne testified that although the parents raised the scheduling issue at the CSE meeting, DOE took no additional steps to accommodate them. She also testified concerning trainings the school offered and stated that in the past, the school had made various accommodations for parents upon request, such as providing

information over the telephone and videotapes.  The student's occupational and speech therapists testified that at-home activities with the student would have been helpful.

The IHO found that DOE committed not only a procedural violation, but also found a substantive violation by failing, over an extended period, to provide at-home parental training.  Specifically, he found that "[t]hese issues could have been addressed by appropriate training," and that DOE's "extended failure to provide that training has likely exacerbated the parents' difficulties."  (IHO Decision at 15).  Nevertheless, the IHO concluded that the violations did not warrant invalidating the entire IEP because the problem "can be appropriately addressed through the provision of at-home services," which the IHO ordered DOE to provide.  *Id*.  Specifically, the IHO determined that the parents should receive five weekly hours of at-home training, for 52 weeks.

In contrast, the SRO addressed only whether DOE's failure to detail parental training in the IEP violated the student's right to a FAPE.  On this subject, the SRO found that while DOE "could have more clearly complied with State regulations by identifying parent counseling and training among the list of services offered," DOE's failure did not rise to the level of denying a FAPE because the IEP stated that parent training was available at the school, the school in fact offered parent training and counseling, and the parents were unlikely to avail themselves of these services in any event.  (SRO Decision at 28.)  The SRO failed, however, to address the substance of the claim in the context of plaintiffs' general argument that DOE failed to provide necessary at-home services.

The Court finds that DOE committed a procedural violation by failing to detail the extent to which the parents would receive counseling and training.  *See Danielle G. v. New York City Dep't of Educ.*, No. 06 CV 2152, 2008 WL 3286579, at *14 (E.D.N.Y. Aug. 7, 2008) (finding

that parental counseling services "should have been detailed" in IEP). That the parents were unlikely, as of April 2010, to attend such services does not redeem DOE's procedural failure. *See R.K.*, 2011 WL 1131492, at *20. Similarly, retrospective testimony that DOE actually offered trainings on weekdays does not remedy the defect. *See P.K.*, 526 F. App'x at 141 ("Parents are entitled to rely on the IEP for a description of the services that will be provided.").

More importantly, the Court finds that the SRO erred in failing to address plaintiffs' claim that DOE failed to provide the student with at-home services he needed, including parental training. The SRO provides no basis for vacating the IHO's order that DOE provide at-home parental training. The Court, moreover, agrees with the "better-reasoned IHO opinion" on this issue and finds that the IHO's compensatory award should be reinstated. *R.E.*, 694 F.3d at 189.[5]

### 2. Additional Substantive Claims

Plaintiffs argue that the IEP was substantively inadequate because it did not provide for a class size yielding a 1:1 educational and behavioral support, adequate speech-language therapy, appropriate goals, or a sufficiently short commute. Each ground is discussed more fully below, and none, alone or in combination, deprived the student of a FAPE.

---

[5] Despite the debate as to whether compensatory education is warranted only if there is a 'gross' violation of the IDEA" for students under twenty-one, *P. v. Newington*, 512 F. Supp. 2d at 112 n.3, the Court finds, for the reasons set forth by the IHO, that DOE's failure to provide the necessary at-home parental training here was a gross violation. *Cf. Student X*, 2008 WL 4980440, at *25 (finding gross violation where, although student "was not completely deprived of all education," DOE wrongfully terminated at-home services). As detailed above, the IHO found that DOE's "extended failure" to provide appropriate parental training "likely exacerbated the parents' difficulties" – specifically, their inability "to appropriately address personal care issues including toileting and feeding as well as to reinforce speech gains made at school and otherwise communicate with the student and encourage socialization." (IHO Decision at 15.) This total, extended failure to train the parents concerning issues as basic as feeding, toileting, and communication for this student rises to the level of a gross violation.

### a.  Class Size

Determining what class size is appropriate for a student "is exactly the sort of policy judgment on which the Second Circuit has instructed that this Court should defer to the SRO." *M.H. v. New York City Dep't of Educ.*, No. 10 CV 1042, 2011 U.S. Dist. LEXIS 17306, at *40 (S.D.N.Y. Feb. 16, 2011) (citing *Watson v. Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004) (stating that class size involves "questions of methodology more appropriately answered by the state and district decision-makers").  Accordingly, the court defers to the SRO's finding, which he made after thoroughly reviewing the DOE and McCarton Center reports, that a 6:1:1 class was the appropriate, least restrictive setting for the student.  The record reflects that the student was progressing in his 6:1:1 classroom setting, where he received 1:1 instruction throughout the day, in short increments, to accommodate his attention difficulties.  The objective evidence indicates that the student was likely to continue making progress in the 6:1:1 setting. *See A.D. ex rel. E.D.*, No. 12 CV 2673, 2013 WL 1155570, at *8 (S.D.N.Y. Mar. 19, 2013) ("[O]nce the CSE determined that a 6:1:1 classroom would be appropriate for the Student, it had identified the least restrictive environment that could meet the Student's needs and did not need to inquire into more restrictive options such as nonpublic programs.").  This claim, therefore, fails.

### b.  Adequacy of Speech-Language Therapy

Plaintiffs correctly maintain that when DOE implemented the IEP in April 2010, the New York regulation governing speech therapy for autistic children required that the student receive speech therapy "for a minimum of 30 minutes daily in groups not to exceed two, or 60 minutes daily in groups not to exceed six."  *P.K.*, 819 F. Supp. 2d at 109 n.9 (quoting 8 N.Y.C.R.R. § 200.13(a)(4)) (granting plaintiffs summary judgment).  In contravention of this regulation,

which was in effect until December 8, 2010, the student's IEP provided for 1:1 speech-language therapy only once per week for thirty minutes and 2:1 speech-language therapy only twice per week for thirty minutes.

However, plaintiffs cite no legal authority, and the Court is aware of none, for the proposition that this regulatory violation is a *per se* FAPE deprivation. *See C.S. v. New York City Dep't of Educ.*, No. 12 CV 3558, 2014 WL 1225529, at *13 (S.D.N.Y. Mar. 25, 2014) (rejecting plaintiffs' argument that IEP's failure to comply with this regulation rendered IEP "*per se* legally inadequate"). Rather, the Court evaluates the speech-language IEP's legal adequacy in light of the student's particular needs. In doing so, the undisputed evidence here demonstrates that the IEP did not deprive the student of a FAPE, notwithstanding services that fell beneath the level required at the time.

Here, the CSE based the student's speech-language IEP on a report that Mahoney-Schneider prepared on March 25, 2010 – approximately one month before the CSE convened to develop the IEP. In this report, Mahoney-Schneider stated that the student had made progress toward his IEP goals of understanding single-word vocabulary and following one-step directives; could follow one-step directions from a variety of communication partners; demonstrated improved understanding of single- and multiple-word phrases, including nouns and verbs; had made progress toward producing two-word phrases and could independently request items using two-word phrases; was beginning to use three-to-four-word phrases to comment on books and other instructional materials; and had reduced his echolalic and irrelevant vocalizations. (*See* SRO Decision at 6.) In light of this progress, Mahoney-Schneider recommended, and the CSE agreed, that the student should continue receiving speech-language therapy at the same rate to allow him to acquire new skills and apply his current skills. (*Id.*)

Accordingly, the IHO found that the student's related service mandates "were consistent with the recommendations of the student's then current providers."  (IHO Decision at 9.)  Further, the IHO found "persuasive" Mahoney-Schneider's testimony that (1) the student "had made progress in the group of two she had recommended in November 2009 to enhance generalization" and was "substantially progressing in achieving the IEP goals"; and (2) the TEACCH program provided the student with additional language enrichment throughout the day.  (*Id*. at 17.)  The SRO, moreover, agreed with the IHO's determination that the speech-language IEP provided the student with a FAPE.  (*See id*. at 29) ("[T]he hearing record does not support the conclusion that the services as recommended . . . were inappropriately designed.")

The Court finds, as did the IHO and SRO, that the CSE appropriately devised the student's speech-language IEP, "its [regulatory] noncompliance notwithstanding," with input from Mahoney-Schneider's progress report and individuals familiar with the student's needs, and the Court defers to the IHO and SRO's expertise on this issue.  *C.S.*, 2014 WL 1225529, at *13.

Accordingly, the speech-language IEP did not deprive the student of a FAPE, and this claim fails.

### c.  Appropriateness of IEP Goals

A student's IEP goals must be designed "both to 'meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum' and to 'meet each of the child's other educational needs that result from the child's disability.'"  *C.H. v. Goshen Cent. Sch. Dist.*, No. 11 CV 6933, 2013 WL 1285387, at *12 (S.D.N.Y. Mar. 28, 2013) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(II)); *see also* 34 C.F.R. § 300.320(a)(2)(i); 8 N.Y.C.R.R. § 200.4(d)(2)(iii).  Each annual goal must include the evaluative criteria, evaluation procedures, and schedules to be used to measure progress toward

meeting the annual goal. 8 N.Y.C.R.R. § 200.4(d)(2)(iii)(b). "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers." *Grim*, 346 F.3d at 382; *see M.H.*, 685 F.3d at 244 (stating that an SRO's "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures"); *see also J.L. v. City Sch. Dist. Of City of New York*, No. 12 CV 1516, 2013 WL 625064, at *13 (S.D.N.Y. Feb. 20, 2013) ("In this Circuit, courts are reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress.") (internal quotation marks omitted).

Here, the IEP contained twelve annual goals and thirty-five short-term objectives in the areas of attending, auditory comprehension, labeling, math, peer interactions, feeding, sensory processing, fine motor, gross motor, adaptive physical education, and expressive, receptive, and pragmatic language. The record reflects that the CSE developed these goals with input from the student's teacher and occupational, physical, and speech-language therapists, who had worked with the student over an extended period. *See E.F.*, 2013 WL 4495676, at *19 (granting summary judgment for DOE, where CSE based student's IEP goals on input from student's teacher and related services providers). The SRO found that the IEP's annual goals and short-term objectives were clearly linked to the student's needs and abilities, which the IEP accurately described. The SRO also found that these goals and objectives contained sufficient specificity to guide instruction, evaluate the student's progress, and gauge his need for any continuation or revision.

Plaintiffs' only argument on this subject is their conclusory assertion that the IEP's goals were too few and rudimentary – specifically, that the IEP contained only one math goal and two

literacy goals.  The only support they proffer is vague citation to pages from the testimony of Bruzzaro, the McCarton Center's occupational therapist.  In fact, Bruzzaro did not, and could not credibly have, opined on matters outside the occupational therapy context.  Moreover, the IHO and SRO did not credit this testimony because Bruzzaro never observed the student in the classroom or provided him services.  Plaintiffs, therefore, provide no reason for the Court to disturb the SRO's finding that the IEP goals were appropriate, and this claim fails.

### d.  Length of Commute

Plaintiffs argue that the student's commute to and from school is too long.  There is no dispute that the student's morning commute takes approximately ninety minutes, and that his afternoon commute takes at least as long.  The student's father testified at the hearing that the student's afternoon commute sometimes took up to two and one-half hours.  Assistant Principal Melbourne testified on September 27, 2010, that the school had reported a "violation" because the student's bus was arriving late to school.  (Tr. 129–31.)  Melbourne indicated that this report would trigger an investigation, but she did not know whether any investigation was actually underway.

Both the IHO and the SRO found that this claim was beyond the amended due process complaint's scope.  The Court disagrees.  While the complaint contains no explicit allegation that the commute is too long, the prayer for relief includes a request for transportation to and from school that takes no more than an hour each way.  Nonetheless, the IHO considered the claim anyway, reasoning that DOE made no objection to him doing so.[6]

---

[6] It is not clear that DOE's mere failure to object would entitle the IHO to consider a claim beyond the complaint's scope.  *See* 20 U.S.C. § 1415(f)(3)(B) ("The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . . , unless the other party agrees otherwise."); 34 C.F.R. § 300.511(d); 8 N.Y.C.R.R. § 200.5(j)(1)(ii).  The question need not be reached, however, as the complaint can be read to include the claim.

Regarding the morning commute, the IHO found that although a ninety-minute trip is very long for a child with interfering behaviors, there was no evidence that the trip adversely affected the student's performance or behavior. Regarding the afternoon commute, the IHO found there was no persuasive evidence that the trip routinely took two and one-half hours. Finally, the IHO concluded that although the commute's length was "of concern," it did not provide a basis for finding the student's placement inappropriate because alternative arrangements were available to remedy the problem if, in fact, the commute was too long. (*See* IHO Decision at 19.) Accordingly, the IHO directed the CSE to reconvene immediately to review the student's trip time and add to the IEP requirements for commute time and conditions appropriate for the student in view of his needs and deficits. (*Id*. at 21.)

The SRO apparently misunderstood the IHO's determination and claimed that the IHO "appropriately declined to award relief with respect to transportation" because plaintiffs neither raised the claim in the complaint nor obtained DOE's consent to expand the hearing's scope. (SRO Decision at 18.) In fact, as explained above, the IHO found that the claim was properly before him and denied relief on the merits, which the SRO failed to address. In any event, the SRO concluded that nothing precluded the IHO from directing the CSE to reconvene to discuss the parents' transportation concerns, and therefore, the SRO did not annul that direction.

Plaintiffs present no evidence that the CSE failed to reconvene or made an improper determination after reconvening. Absent such an allegation, the Court lacks any reason to believe that the claim remains unresolved. The claim, therefore, fails.

**B. Claims Concerning Implementation of the 2010–2011 IEP**

Plaintiffs argue that as a practical matter, defendant failed to implement the IEP because the classroom paraprofessional lacked adequate training, a student teacher sometimes provided

the student's speech therapy, and the student did not receive adequate services during summer 2010. These claims are beyond the scope of the amended due process complaint and are unexhausted. *See L.K.*, 2011 WL 12706, at *10. In any event, the claims lack merit.

### 1. Classroom Paraprofessional's Training

Plaintiffs argue that Jules, the paraprofessional who worked in the student's classroom, was unqualified to meet the student's needs because Jules has no licenses or certifications, received insufficient training to teach children with autism, and never read the student's IEP. A paraprofessional hired on or before January 8, 2002, must, by January 8, 2006, complete at least two years of study at an institution of higher education (or fulfill an enumerated alternative requirement). 34 C.F.R. § 200.58; *see also* 8 N.Y.C.R.R. § 120.6. Jules has a college degree and fourteen years of experience working for DOE as a classroom paraprofessional. He also testified that he attends a workshop regarding students with autism every September. Plaintiffs present no authority to support their claim that, as a matter of law, Jules is insufficiently trained. Accordingly, this claim is meritless.

### 2. Student Teacher's Participation in Speech Therapy

The record reflects that approximately midway through the 2010–2011 school year, speech-language therapist Mahoney-Schneider allowed a graduate student to work directly with the student twice a week. Mahoney-Schneider testified that on such occasions, she was "right there" to ensure that the graduate student was using the strategies Mahoney-Schneider had taught her, along with a lesson plan that would meet the student's goals. (Tr. 908.) The Court is aware of no authority – and plaintiffs provide none – that this arrangement was improper or otherwise interfered with the student's progress. Accordingly, this claim lacks merit.

### 3. Summer 2010

Plaintiffs argue that DOE failed to provide the student a FAPE during the summer 2010 session. The SRO found, and the Court agrees, that this claim is unexhausted because plaintiffs neither raised it in their amended due process complaint nor obtained DOE's permission to expand the hearing's scope to include it.

In any event, the record, which plaintiffs have augmented with the additional discovery Magistrate Judge Go permitted, does not support a finding that DOE failed to provide a FAPE during the summer session. The record reflects that, due to construction, DOE placed the student in a school across the street from P.S. 256 for the summer. His teacher, classroom paraprofessional, and therapists during the summer were not the same people who worked with him beginning in September 2010. His summer teacher was also switched midway through the session. Assistant Principal Melbourne testified, though she did not provide corroborating evidence, that the student received all of his mandated related services for the entire 2010–2011 school year. Not surprisingly, the student's summer 2010 teachers, who each taught him for approximately two or three weeks, could not recall a significant amount about the student's unique needs or curriculum at their depositions two years after the fact,

Even if the record reflected that DOE failed to provide all of the services to which the student was entitled during the summer, the deprivation did not violate his right to a FAPE because the record reflects that he made progress over the summer. The IEP goals update from August 10, 2010, indicates that he had made progress toward half of his annual IEP goals and was expected to meet all of them. His October 2010 Brigance Inventory also reflected that he had made progress over the summer. This claim, therefore lacks merit.

.

### C.  Appropriate Relief

#### 1.  Compensatory Education

As explained above, the Court finds that DOE violated the student's right to a FAPE only insofar as it failed to provide the parents at-home training (*see* Part II(A)(1)(d), *supra*).  The compensatory, at-home parental training the IHO ordered "appropriately addresse[s] the problems with the IEP" and is, therefore, the appropriate remedy.  *P. v. Newington*, 546 F.3d at 123; *see R.E.*, 694 F.3d at 189.

Plaintiffs are not, however, entitled to "retroactive reimbursement" for private school tuition or related private services, as they never enrolled the student in private school for the 2010–2011 academic year and present no evidence that they paid for related private services. *Burlington*, 470 U.S. at 370; *see Student X*, 2008 WL 4890440, at \*24 n.18 (granting compensatory award of at-home services, but finding that plaintiffs were not entitled to reimbursement because they failed to present evidence of any expenditure).  Moreover, even if plaintiffs had unilaterally enrolled the student in private school, they would not qualify for retroactive tuition reimbursement because they fail to make the threshold showing that DOE deprived the student of a FAPE.  *See Burlington*, 470 U.S. at 370; *F.L.*, 2012 WL 4891748, at \*5.  For this same reason, plaintiffs are not entitled to a prospective injunction directing DOE to place the child in private school.  *See Burlington*, 470 U.S. at 369.  While the Court is sympathetic to the student's difficulties, and to his parents' wish to provide him with all possible benefits, plaintiffs simply do not satisfy the legal requirements for the Court to find that the student had a right to attend private school for the 2010–2011 year.

### 2. Leave to File Application for Partial Attorneys' Fees

"In any action or proceeding brought under [the IDEA], the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." *B.W. ex rel. K.S. v. New York City Dep't of Educ.*, 716 F. Supp. 2d 336, 343 (S.D.N.Y. 2010) (quoting 20 U.S.C. § 1415(i)(3)(B)(i)). "Proceedings" brought under the IDEA include IHO hearings. *Id.* To be a prevailing party, one must either "secure a judgment on the merits or be a party to a settlement agreement that is expressly enforced by the court through a consent decree." *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 894 F. Supp. 2d 415, 424 (S.D.N.Y. 2012) (internal quotation marks omitted). The Supreme Court and the Second Circuit have interpreted this standard "generously," and prevailing party status does not require victory on all issues. *Id.* (internal quotation marks omitted). Rather, the party "must 'succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit.'" *Id.* (quoting *B.W.*, 716 F. Supp. 2d at 345).

While plaintiffs do not succeed on their claims seeking to invalidate the entire IEP, receive compensatory education besides parental training, and obtain prospective funding for private school, they do succeed on their claim for compensatory parental training. "This partial victory meets the generous standard set by the Supreme Court" because the compensatory education award materially alters the legal relationship between the parties. *Student X*, 2008 WL 4890440, at *27. The Court, therefore, declares plaintiffs the prevailing parties solely with respect to the claim for compensatory parental training, and orders the parties to confer on the subject of attorney's fees in an effort to reach an agreement. In the absence of such agreement, the parties are to notify the Court and propose a briefing schedule on the application.

## CONCLUSION

With respect to all issues other than compensatory parental training, the SRO's decision is affirmed, plaintiffs' motion for summary judgment is denied, and DOE's cross-motion for summary judgment is granted. However, to the extent the SRO annulled the IHO's award of compensatory parental training, plaintiffs' motion for summary judgment is granted, DOE's cross-motion for summary judgment is denied; as such, the SRO's decision is reversed in part, and the IHO's award of compensatory training is reinstated.

The Court orders the parties to confer and submit within 14 days of the date of this Memorandum and Order a proposed judgment consistent with the Court's ruling herein.

The Court further orders the parties to confer on the subject of attorney's fees in an effort to reach an agreement. In the absence of such agreement, the parties are to notify the Court no later than June 1, 2014, and propose a briefing schedule on the application.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
      March 30, 2014

_____
ROSLYNN R. MAUSKOPF
United States District Judge